

**SO ORDERED.**

**SIGNED this 30 day of September, 2016.**

_____

**David M. Warren**
**United States Bankruptcy Judge**

_____

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### NEW BERN DIVISION

**IN RE:**                                                      **CASE NO. 15-01033-5-DMW**

**GLENN M. TILLMAN II**

                                                                **CHAPTER 13**

                   **DEBTOR**


### MEMORANDUM OPINION AND ORDER

This matter comes before the court upon the Motion for Relief from the Automatic Stay and, in the Alternative, for Adequate Protection ("Stay Motion") filed by Charles and Wanda Hughes (collectively "Hughes") on October 6, 2015 and the Response to Motion for Relief from Automatic Stay ("Stay Response") filed by Glenn M. Tillman II ("Debtor") on October 29, 2015 and upon the Motion for Evaluation and Treatment of Claim ("Valuation Motion") and Motion to Avoid Judicial Liens ("Avoidance Motion") filed by the Debtor on January 15, 2016 and the Response in Opposition to Debtor's Motion to Avoid Lien of Charles and Wanda Hughes ("Valuation and Avoidance Response") filed by Hughes on January 19, 2016.  The court conducted a hearing ("Hearing") in New Bern, North Carolina on March 17, 2016.  J. Allen Murphy, Esq.

and Jonathan E. Friesen, Esq. appeared on behalf of the Debtor, Ramsay Tyler Archie, Esq. appeared on behalf of Hughes, and Joseph A. Bledsoe III, Esq. ("Trustee") appeared as the Chapter 13 trustee in this case.

The predominant issue before the court is the valuation of real property of the Debtor's bankruptcy estate, specifically whether a manufactured[1] home situated upon that property is sufficiently attached to the land under state law to be included in the valuation. At the Hearing, the Debtor presented testimony from Charles Hughes ("Mr. Hughes"), the Debtor, and Joe C. Sumrell ("Sumrell") of Sumrell's Appraisal Service of Emerald Isle, North Carolina. Hughes presented testimony from Jerry D. Shackelford II ("Shackelford") of Shackelford & Associates, Greenville, North Carolina and Terry L. Andrews ("Andrews"), owner of Modular Technologies, Incorporated of Kinston, North Carolina. The Debtor and Hughes stipulated that Sumrell and Shackelford were each experts in the area of appraising manufactured homes and real property, particularly in Eastern North Carolina. Andrews is a general contractor whose company sets up and installs commercial and residential modular and mobile homes in several southeastern states, and Hughes tendered him as an expert in the sale and installation of mobile homes. The court accepted Sumrell, Shackelford, and Andrews as expert witnesses for these purposes pursuant to Rule 702 of the Federal Rules of Evidence. Based upon the pleadings, testimony, and other evidence presented and upon the arguments of counsel, the court makes the following findings of fact and conclusions of law:

---

[1] The terms "manufactured home" and "mobile home" are used interchangeably.

BACKGROUND

1.      The Debtor filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code ("Code") on February 25, 2015 ("Petition Date"), and the court appointed the Trustee to administer the estate pursuant to 11 U.S.C. § 1302.[2]

2.      The Debtor is the sole owner of approximately 0.16 acres of real property ("Lot") located at 118 Snow Goose Lane, Newport, North Carolina.  The Lot is located within Goose Creek Landing, a manufactured home community in Carteret County, North Carolina.[3]  The Debtor also owns a 1990 Southern Dreams Mobile Home ("MH"), serial number SSLAL 14907, which is located on the Lot.  On the Petition Date and at all times thereafter, the Debtor has resided in the MH.

3.      The Debtor's Amended Schedules filed with the court on February 24, 2016 state that on the Petition Date, the Lot had a value of $65,000.00, and the MH had a value of $35,000.00. The Debtor claimed a homestead exemption in the Lot and the MH (collectively referred to as "Property") in the amount of $30,000.00 pursuant to N.C. Gen. Stat. § 1C-1601(a)(1).

4.      Hughes owned the Property prior to the Debtor.  Hughes purchased the Property in June, 2000, and since that time and at all times relevant to this matter, the MH has been on the Lot. Hughes received from the sellers a deed to the Lot and the MH's certificate of title ("MH Title"), which was forwarded to the North Carolina Division of Motor Vehicles ("DMV") to have the MH titled in Hughes' names.

---

[2] Further references to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.*, excluding formal citations, shall be by section number only.

[3] The Lot is comprised of a 1/251st undivided interest in Goose Creek Landing, and its owner has a designated exclusive right to use lot 232. This real property ownership is a bit unusual; however, that peculiarity does not affect the ownership of the Lot.

5.      The MH had been on the Lot for about 10 years before Hughes' acquisition of the Property.  During the time Hughes owned the Property, no modifications were made to the MH's foundation, and the MH had a vinyl skirting.

6.      Hughes sold the Property to the Debtor on June 2, 2011.  The deed of the Lot from Hughes to the Debtor does not contain any reference to the MH, but the MH Title indicates an assignment from Hughes as sellers to the Debtor as buyer on July 25, 2011.

7.      The sales price of the Property from Hughes to the Debtor was $144,900.00.  To finance the purchase of the Property, the Debtor obtained a loan from I.T. Bagley, Jr. and Nancy J. Bagley (collectively "Bagley") in the amount of $117,000.00, evidenced by a promissory note ("Bagley Note") dated June 2, 2011 and a loan from Hughes in the amount of $17,900.00, also evidenced by a promissory note ("Hughes Note") dated June 2, 2011.

8.      To secure the Bagley Note, the Debtor executed a deed of trust ("Bagley Deed of Trust") encumbering the Lot and any property affixed thereto.[4]  The Debtor also executed an undated security agreement granting Bagley a security interest in the MH.  Bagley's lien on the MH is noted on the MH Title, and the Bagley Deed of Trust is recorded in Book 1377, Page 238 of the Carteret County Register of Deeds.  The Bagley Deed of Trust does not reference the MH.

9.      To secure the Hughes Note, the Debtor executed a deed of trust ("Hughes Deed of Trust") upon the Lot and any property affixed thereto.[5]  The Hughes Deed of Trust is recorded in Book 1377, Page 239 of the Carteret County Register of Deeds, just after the Bagley Deed of Trust. Like the Bagley Deed of Trust, the Hughes Deed of Trust does not reference the MH.

---

[4] The parties stipulated that the Bagley Deed of Trust encumbers the Lot and "any property affixed thereto."
[5] The parties stipulated that the Hughes Deed of Trust encumbers the Lot and "any property affixed thereto."

10.     After the Debtor's purchase of the Property, various creditors obtained the following judgments against the Debtor which created liens ("Judicial Liens") upon the Debtor's real property in Carteret County, North Carolina:

| Creditor Name | Judgment Lien Priority | Carteret County File Number | Amount[6] |
|---|---|---|---|
| Carl Perry | 1st | 09-CVM-352 | $ 545.72 |
| Carl Perry | 2nd | 09-CVD-1608 | $5,297.45 |
| Carl Perry | 3rd | 10-M-235 | $69.13 |
| Havelock Building Supply | 4th | 10-CVM-297 | $120.16 |
| Yoham Zary | 5th | 10-CVM-310 | $1,809.79 |
| Sunland Building, Inc. | 6th | 10-CVM-335 | $407.20 |
| Sound Bank | 7th | 10-CVM-417 | $6,745.38 |
| Boulia Enterprise | 8th | 10-CVD-600 | $7,826.00 |
| Cedar Point Tire, Inc. | 9th | 10-CVM-729 | $775.94 |
| Carolina Home and Garden, Inc. | 10th | 10-CVM-730 | $2,751.65 |
| Paul Christopher Boie | 11th | 11-CVM-259 | $1,050.00 |
| Blance Delgado | 12th | 11-CVM-469 | $3,608.67 |
| Border Magic | 13th | 11-CVS-1258 | $88,377.50 |
| Ally Financial | 14th | 12-CVD-399 | $2,924.00 |
| Wanda Hughes | 15th | 12-CVM-347 | $1,790.00 |
| Charles W. Hughes | 16th | 14-CVM-421 | $7,854.00 |

11.     On the Petition Date, the indebtedness due under the Bagley Note was $106,390.83[7] ("Bagley Claim"), and the indebtedness due under the Hughes Note was $21,319.65 ("Hughes Claim").[8]

12.     The Debtor and Hughes stipulated that Bagley has a first priority lien ("Bagley Lien") on the Property, and Hughes has a second priority lien ("Hughes Lien") on the real property described in the Hughes Deed of Trust.[9]

---

[6] According to the Avoidance Motion, the amounts include interest and attorneys' fees as of the Petition Date.

[7] This amount is evidenced by a Proof of Claim filed by Bagley on May 15, 2015.  At the Hearing, the parties stipulated that the amount owed to Bagley was between $106,059.00 and $106,390.83, and the court accepts the amount set forth in the Proof of Claim as the correct figure.

[8] This amount is evidenced by an amended Proof of Claim filed by Hughes on October 6, 2015.

[9] The difference is that Bagley has a security agreement and lien noted on the MH Title, and Hughes does not. Both the Bagley Deed of Trust and the Hughes Deed of Trust accurately describe the real property owned by the Debtor.

13.     The Debtor's Chapter 13 Plan—Amended ("Plan") filed on May 4, 2015 proposes to treat the Bagley Claim as fully secured, with the Debtor to make contractual payments due under the Bagley Note directly to Bagley, outside the Plan.  The Plan makes no specific proposal for treatment of the Hughes Claim.  The Plan provides that "[g]eneral unsecured claims shall be paid through the plan pro rata to the extent that funds are available after disbursements are made to pay secured claims, arrearage claims, priority claims, and other specially classified claims."  The Plan sets forth the Debtor's intention to seek avoidance of the Judicial Liens pursuant to § 522(f).  The Plan has not been confirmed pursuant to § 1325.

14.     In the Stay Motion, Hughes asserted that the Debtor has not made a payment on the Hughes Note since June 3, 2013, entitling Hughes to relief from the automatic stay imposed by § 362 to allow foreclosure proceedings under the Hughes Deed of Trust.  In the Stay Response, the Debtor requested that a ruling on the Stay Motion be postponed to allow the Debtor to seek avoidance of the Hughes Lien and the Judicial Liens.

15.     In the Valuation Motion, the Debtor alleged that the value of the Property is $100,000.00, which is less than the amount of the Bagley Claim.  The Debtor requested the court to determine that the Hughes Claim is wholly unsecured under § 506(a), rendering the Hughes Lien void pursuant to § 506(d).  In the Avoidance Motion, the Debtor asserted that all of the Judicial Liens impair his homestead exemption and should be avoided pursuant to § 522(f)(1)(A).

16.     In the Valuation and Avoidance Response, Hughes contended that the value of the Property is $130,000.00 which exceeds the amount of the Bagley Claim; therefore, § 1322(b)(2) prevents the Debtor from stripping the Hughes Lien.

17.     At the Hearing, the Debtor for the first time took the position that the MH is not attached to the Lot and cannot add value to the real estate securing the Hughes Claim.  Hughes

6

disagreed and contended that the Hughes Deed of Trust encumbers the entire Property, consisting of both the Lot and the MH.  Hughes asserted that the Property's value is sufficient to allow the Hughes Claim as fully secured; however, Hughes conceded that the Judicial Liens are probably avoidable under § 522(f).

18.     The parties are $30,000.00 apart in their valuation of the Property and disagree about whether the Hughes Lien encumbers the MH in addition to the Lot; therefore, the court considered the witnesses' testimonies to aid its resolution of these differences.

<u>MH Foundation Testimony</u>

19.     Mr. Hughes, a licensed general contractor and a licensed real estate broker, testified about the MH and its foundation.  Mr. Hughes described the MH as being supported by piers and metal tie-down straps with metal anchors.  After Hughes sold the Property to the Debtor, the Debtor replaced the MH's vinyl skirting with brick underpinning to resemble a foundation.  The MH has two porches: one is partially covered, and one is fully covered.

20.     Mr. Hughes had "no concern" with the MH's foundation.  The MH has a certificate of occupancy from a Carteret County building inspector and which has never been revoked.  Mr. Hughes verified that the Carteret County Tax Collector treats the MH as real property and denotes it as "manufachomperm" meaning "manufactured home-permanent."

21.     Upon cross-examination, Mr. Hughes acknowledged that the North Carolina Building Code Council and the North Carolina Department of Insurance published the *State of North Carolina Regulations for Manufactured Homes 2004 edition* ("Regulations").  Section 3.7.3 of the Regulations requires that "[p]iers shall be constructed of 8" x 8" x 16" open or closed cell masonry concrete blocks," and further defines the requisite type and grade of that block.  Mr. Hughes stated that the MH's piers are constructed from the appropriate type of block, and

according to a Carteret County building inspector, the MH was in compliance with local codes when Mr. Hughes bought the MH.

22.     Also upon cross-examination, Mr. Hughes acknowledged that section 3.6.4.2 of the Regulations provides that footings for piers shall be poured integrally with the wall footing, the wall support and pier support shall be six inches thick, the section supporting the wall must be eight inches wide, and footing supporting a pier must extend at least two inches beyond the edges of the pier.  Mr. Hughes believes that the MH's piers have appropriate footings but has not made a visual inspection.

23.     In his testimony, the Debtor confirmed that he replaced the vinyl skirting with brick skirting for cosmetic purposes, and the brick skirting does not support the MH.  The Debtor did not agree that the brick skirting was permanent, but he has no plans to remove the brick skirting.

24.     The Debtor attempted to sell the Property for a period beginning April 15, 2013 and ending February 25, 2015.  According to a listing by Jones Enterprises of Atlantic Beach, North Carolina published on the local board of realtors' Multiple Listing Service ("MLS"),[12] the Debtor's representation of the MH's foundation's condition was as follows:  "FOUNDATION TO CODE" (emphasis in original), indicating that the MH was in compliance with applicable building codes.

25.     Sumrell provided testimony about the Property and indicated that the MH is permanently connected to a septic tank or sewage system and other utilities.  The towing hitch, wheels, and axel have been removed.  Sumrell's written appraisal ("Sumrell Property Appraisal")[13] dated June 30, 2015 states that the MH is "attached to a permanent foundation system;" however, Sumrell stated he did not crawl underneath the MH to inspect the foundation.

---

[12] The MLS is a tool developed by the National Association of Realtors to help listing brokers find cooperative brokers working with buyers to help sell real property.

[13] The Sumrell Property Appraisal was admitted into evidence as both the Debtor's Exhibit 12 and Hughes' Exhibit E.

26.     Shackelford first testified about a written appraisal ("Walters Property Appraisal")[14] of the Property dated May 12, 2000 and signed by J.P. Walters III ("Walters"). Walters formerly worked for Raspberry & Associates ("Raspberry") of Kinston, North Carolina. Shackelford began working for Raspberry in 2001 and worked with Walters.  Shackelford purchased Raspberry in 2005 and changed the name to Raspberry, Shackelford and Associates. Subsequently, he changed the name to Shackelford & Associates which is the name under which the business operates today.

27.     Shackelford stated that he was familiar with Walters' abilities as an appraiser and had no reason to doubt the accuracy of Walters' work product.  The Walters Property Appraisal is outdated for its valuation of the Property but includes relevant information about the MH.  The Walters Property Appraisal includes a Mobile Home Addendum on which Walters placed a check mark by each of the following representations: "All foundations, both perimeter and piers [sic] have footings which are located below the frost line (if applicable) and have been constructed in accordance with state and local building codes," and "The manufactured housing unit is permanently affixed to a foundation (which must be verified thrue [sic] the local building inspectors [sic] office)."

28.     Shackelford next testified about his own written appraisal ("Shackelford Property Appraisal") dated July 22, 2015.[15]  The Shackelford Property Appraisal indicates that the MH has a brick foundation.

29.     Andrews described the difference between a pier foundation and a curtain wall foundation.  The curtain wall foundation has outside perimeter walls that support the structure. Curtain wall foundations are normally used in commercial construction.  A pier foundation

---

[14] The Walters Property Appraisal was admitted into evidence as Hughes' Exhibit K.
[15] The Shackelford Property Appraisal was admitted into evidence as Hughes' Exhibit G.

supports the structure through several internal piers throughout the footprint of the structure. The MH is supported by a pier foundation, and while the MH has brick skirting, that improvement is for aesthetics and not for support.

30.    Upon examination of a picture of a representative foundation pier provided by the Debtor, Andrews stated that he could not see a block footing pad underneath the eight inch pier blocks but could not imagine any county building inspector approving a mobile home for occupancy without those footings in place.

31.    The Debtor, as a rebuttal witness, testified that he had crawled under the MH and dug underneath a representative foundation pier. He testified that the pier had no solid footing pad below the cinder block piers. He offered a cellular phone photograph of very poor quality to support his testimony.

<u>Valuation Testimony</u>

32.    Andrews, who is board member of Goose Creek Landing and frequent investor in property within the subdivision, described Goose Creek Landing as a unique and desirable community located at the mouth of Goose Creek and upon the Intercoastal Waterway. The ability to for 35 and 36 foot boats to access quickly the Beaufort Inlet, Bogue Inlet, and Intercoastal Waterway adds value to the properties located within Goose Creek Landing. Goose Creek Landing includes other amenities such as a boat dock, boat ramps, fishing pier, swimming pool, playground, basketball court, and picnic area.

*MH and Lot Valuation*

33.    The Sumrell Property Appraisal values the Property at $100,000.00 as of June 29, 2015. Sumrell conceded that only 10 percent of his appraisal business consists of manufactured home appraisals, and he generally does not conduct an interior inspection of the comparable sales

he uses.  Sumrell did not identify the MH by make and model, and he mistakenly stated the MH was manufactured in 1988 when it actually was produced in 1990.  Sumrell based his valuation upon sales of comparable lots with manufactured homes located at 309 Snow Goose Lane and 310 Snow Goose Lane which are both within Goose Creek Landing.  Sumrell also compared a third sale located outside Goose Creek Landing at 741 Broad Creek Loop Road, Newport, North Carolina, which is 3.75 miles from the Property.  Sumrell only added $10,000.00 (11%) as a location adjustment for that comparable sale.

34.    In the Sumrell Property Appraisal, Sumrell noted that "[b]ased upon local MLS [sic] subject has not been offer [sic] for sale in the past twelve months."  On cross-examination, Sumrell stated that the Debtor's testimony that the Property had been recently listed for sale was "news to me."  Sumrell admitted that he must have "missed" the listing in the MLS.

35.     The Shackelford Property Appraisal values the Property at $130,000.00 as of July 22, 2015.  The comparable sales used by Shackelford in determining this value were located at 310 Snow Goose Lane which is 1.2 miles from the Property, 106 Snow Goose Lane which is 0.06 miles from the Property, and 102 Snow Goose Lane which is 0.08 miles from the Property.  Each of these comparable sales is within Goose Creek Landing and in very close proximity to the Property.  Shackelford made a $10,000.00 negative location adjustment to 310 Snow Goose Lane because of its more favorable location compared to the Property.  The other two comparable sales had no adjustment for location and were generally similar to the Property, but Shackelford made adjustments for dissimilarities in the sizes, amenities, and conditions of the manufactured homes.

36.    When the Debtor marketed the Property for sale in 2013, the list price was originally $194,900.00.  In 2014, that price was reduced to $159,900.00.  On October 14, 2014,

11

the Debtor received a contract for the purchase of the Property for the price of $140,000.00; however, that sale did not close because the proposed buyer could not obtain financing.

37.     Andrews has bought and sold many properties in Goose Creek Landing.  When asked whether he would purchase the Property for $107,000.00, an amount slightly higher than the Bagley Claim, Andrews immediately responded that he would, indicating that he could probably sell it for more.

*Lot Only Valuation*

38.     Sumrell also testified about his written appraisal ("Sumrell Lot Appraisal")[17] which provides that the value of the Lot without the MH was $65,000 as of January 21, 2016.  Sumrell's testimony was inconsistent on the sales history for comparable sales.  He initially testified that he could not find in MLS any comparable lot-only sales inside Goose Creek Landing within the prior 12 months, but upon further examination, Sumrell corrected his answer and stated that comparable lot sales could not be found inside Goose Creek Landing for a period of 36 months prior to the Sumrell Lot Appraisal.  Sumrell expanded his MLS comparable sales search to a 10 mile radius from the Lot.  He could not find any sales having amenities similar to those found within Goose Creek Landing, so he used lot sales farther away from the Lot but within the prior 12 months.

39.     The comparable sales that Sumrell used to determine the land value were 162 Rouseville Lane, Newport, North Carolina which is 7.34 miles from the Property; 1537 Nine Mile Road, Newport, North Carolina which is 6.53 miles from the Property; and 110 Barbour Drive, Newport, North Carolina which is 4.81 miles from the Property.  Sumrell made positive location adjustments of $25,000.00 for 162 Rouseville Lane, $27,500.00 for 1537 Nine Mile Road, and $37,000.00 for 110 Barbour Drive.  Sumrell made these respective location adjustments of 62.5%,

---

[17] The Sumrell Lot Appraisal was admitted into evidence as both the Debtor's Exhibit 11 and Hughes' Exhibit F.

12

73% and 134% to compensate for the higher values found inside Goose Creek Landing because of its location and amenities.

40.     When asked why he made only an 11% location adjustment for the non-Goose Creek Landing comparable sale in the Sumrell Property Appraisal compared to the substantial adjustments made for the non-Goose Creek Landing comparable sales in the Sumrell Lot Appraisal, Sumrell stated that the Sumrell Lot Appraisal was done seven months later than the Sumrell Property Appraisal. Sumrell reasoned that the passage of time affects prices; however, he conceded that area prices did not fluctuate significantly during that seven-month period.

41.     Shackelford also made a written appraisal ("Shackelford Lot Appraisal") for the Lot only, which valued the Lot at $112,000.00 as of March 15, 2016. Shackelford could not find any land sales in MLS during the three years prior to his appraisal, so he considered other sources, including "market participants" and the parties involved in those sales, in order to find more relevant comparable land sales. Those sales were outside of the MLS system, but Shackelford believed them valid comparisons. Each of the comparable land sales was in Goose Creek Landing, and one of the comparable sales was $135,395.00 for 210 Snow Goose Lane which is "next door" to the Property. The 210 Snow Goose Lane property was sold by Bagley, who holds the senior lien on the Property.

42.     Andrews was the purchaser of one of Shackelford's comparable land sale located at 309 Snow Goose Lane. Andrews' opinion of values in Goose Creek Landing suggests that Shackelford's land valuations are accurate if not conservative.

DISCUSSION

Jurisdiction

1.      This matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B) and (O), and the court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

Valuation Motion

2.      The court will first address the Valuation Motion, because the Hughes Lien is senior in position to the Judicial Liens and its effect on the Debtor's real property will affect the court's determination of the Avoidance Motion.  In addition, until the secured status of the Hughes Claim and extent of the Hughes Lien are determined, the court cannot properly adjudicate the Stay Motion.

*Claim Bifurcation and Chapter 13 Anti-modification Clause*

3.      Ordinarily under the Code, an allowed claim of a creditor which is secured by a lien on property of the estate is a secured claim only to the extent of any value in the collateral property to which the creditor's lien can attach and is an unsecured claim for the balance. 11 U.S.C. § 506(a).  If there is no value to which the lien can attach, then the claim is wholly unsecured, and the creditor's lien is void. 11 U.S.C. § 506(d).

4.      In Chapter 13, a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in *real property* that is the *debtor's principal residence* . . . ." 11 U.S.C. § 1322(b)(2) (emphases added).  The United States Supreme Court held that this provision of the Code prohibits a debtor from using § 506(a) to bifurcate a claim secured by the debtor's residence. *Nobleman v. American Savings Bank*, 508 U.S. 324, 113 S. Ct. 2106,

14

124 L.Ed.2d 228 (1993).  This court interprets *Nobleman* to apply only to claims which are partially secured under § 506(a), and if a claim is wholly unsecured under § 506(a), then an underlying lien on the debtor's residence is void under § 506(d). *In re Kidd*, 161 B.R. 769, 770-71 (Bankr. E.D.N.C. 1993).  However, if that claim can be allowed as secured claim under § 506(a) for any amount, no matter how small, then the anti-modification provision of § 1322(b)(2) kicks in, preventing bifurcation in a Chapter 13 proceeding.

     5.     In the Code, "debtor's principal residence"—

     (A)     means a *residential structure*, including incidental property, without regard to whether that structure if used as the principal residence by the debtor, is attached to real property; and

     (B)     includes an individual condominium or cooperative unit, a mobile or manufactured, or trailer if used as the principal residence by the debtor.

11 U.S.C. § 101(13A) (emphasis added).  This definition, which was added to the Code by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), qualifies a manufactured home as the debtor's principal residence irrespective of its attachment to real property.  The provision is seemingly at odds with § 1322(b)(2)'s applicability only to *real property* which is the debtor's principal residence.  The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") addressed this conflict and found that the anti-modification provision of § 1322(b)(2) "has two distinct requirements:  first, the security interest must be in real property, and second, the real property must be the debtor's principal residence." *Ennis v. Green Tree Servicing, LLC (In re Ennis)*, 558 F.3d 343, 345-46 (4th Cir. 2009).

     6.     In *Ennis*, the creditor held a security interest in the debtors' manufactured home which served as their principal residence and was situated upon real property which the debtors rented.  The Fourth Circuit rejected the creditor's argument that BAPCPA's addition of the definition for "debtor's principal residence" reflected an intent to define real property in Chapter

15

13 not under state law but under a "broader and uniform definition." *Id.* at 345 (quoting Appellee's Br. 3). The Fourth Circuit concluded that the real property requirement of § 1322(b)(2)'s anti-modification clause survives the definition of "debtor's personal residence;" therefore, the creditor's claim could be bifurcated, because the debtors' manufactured home constituted personal property under Virginia law. *Id.* at 346-47.

7.        This case presents the opposite situation of *Ennis* in that Hughes does not have an express security interest in the MH but a lien only upon the real property Lot, which includes "any property affixed thereto." The court must determine whether the MH is part of the real estate and encumbered by the Hughes Lien. If so, then § 1322(b)(2) prevents the Debtor from bifurcating the Hughes Claim as proposed in the Plan unless the value of the Property is less than the amount of the Bagley Claim, making the Hughes Claim wholly unsecured. If the MH is personal property unaffixed to the Lot, as contended by the Debtor, then the Hughes Claim can be bifurcated. While the Lot is real property, it cannot alone be the debtor's personal residence, because it is not a "residential structure" as required by § 101(13A).

*Classification of MH as Real vs. Personal Property*

8.        "Property interests are created and defined by state law." *Butner v. United States,* 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979). The court must examine North Carolina law to determine whether the MH is real or personal property. *See*, *e.g.*, *Ennis*, 558 F.3d at 346 (applying Virginia law to determine whether a mobile home would be considered real or personal property).

9.        North Carolina has three requirements that must be met in order for a manufactured home to be considered real property:

(1)        It is a residential structure;

16

(2)    It has the moving hitch, wheels, and axles removed; and

(3)    It is placed upon a permanent foundation either on land owned by the owner of the manufactured home or on land in which the owner of the manufactured home has a leasehold interest . . . .

N.C. Gen. Stat. § 105-273(13)(d) (2016).  In this case, the parties stipulated that the first two requirements have been satisfied and are not in dispute.  With respect to the third requirement, the parties agree that the MH is situated upon land owned by the Debtor but disagree as to whether the MH is placed upon a permanent foundation.

10.    The Debtor supports his argument that the MH is not on a permanent foundation by noting that he did not, in accordance with N.C. Gen. Stat. § 20-109.2, either surrender the MH Title or submit an affidavit to the DMV that the MH qualifies as real property.  This statute provides as follows:

(a)    Surrender of Title. – If a certificate of title has been issued for a manufactured home, the owner listed on the title has the title, and the manufactured home qualifies as real property as defined in G.S. § 105-273(13), the owner listed on the title shall submit an affidavit to the Division that the manufactured home meets this definition and surrender the certificate of title to the Division.

(a1)    Surrender When Title Not Available. – If a certificate of title has been issued for a manufactured home, no issued title is available, and the manufactured home qualifies as real property as defined in G.S. 105-273(13), the owner listed on the title shall be deemed to have surrendered the title to the Division if the owner of the real property on which the manufactured home is affixed (i) submits an affidavit to the Division that the manufactured home meets the definition of real property under G.S. 105-273(13) . . . and (ii) submits a tax record showing the manufactured home listed for ad valorem taxes as real property pursuant to Article 17 of Chapter 105 of the General Statutes in the name of the record owner of the real property on which the manufactured home is affixed.

NCGS § 20-109.2 (2016).

11.    The Debtor did not have the MH Title, because it was in Bagley's possession, and the Debtor either elected not to file or neglected to file an affidavit that the MH qualifies as real property.  The lack of the surrender of the MH Title and the lack of filing of an affidavit is not

17

conclusive evidence that the provisions of N.C. Gen. Stat. § 105-273(13) have not been met.  That determination must be made by a review of the evidence and an analysis of the case law.

12.     The Debtor referenced a portion of the Personal Property Appraisal and Assessment Manual dated June 2007 by the North Carolina Department of Revenue Property Tax Division in support of its allegation that the MH is not on a permanent foundation.  The relevant portion of that manual states as follows:

> The Department of Insurance has issued building codes for the insulation of manufactured homes.  The only foundation required by the building code for a manufactured home is footings and piers.  The footings are either of the poured concrete type or a pre-cast solid concrete pad.  The size and dept [sic] of the footing depends on the type of home and the location of the home.  The Building Code states that '[t]he bottom of all footings shall be below the frost line or a minimum of 4 inches below finished grade, whichever is greater.'  The frost line varies across the state and there is a chart on the Building Code that shows the frost line by County [sic].  The piers are either single stacked or double stacked.  The number and placement of the piers is dictated by the Building Code.  It is our opinion that all manufactured homes have a permanent foundation if their installation is in compliance with the Building Code.

N.C. Dept. of Revenue, Property Tax Division, Personal Property Appraisal and Assessment Section 7 pp. 4-5 (June 2007).

13.     At least as the North Carolina Department of Revenue is concerned, if a structure meets the applicable building code as enforced by county building inspectors, then a manufactured home properly sits on a foundation.  Mr. Hughes stated in his testimony that he had "no concern" with the MH's foundation and confirmed that the Carteret County Tax Collector designated the MH and Lot as "manufactured home-permanent."

14.     Further factual support that the MH was on a permanent foundation is the unopposed finding in the Walters Property Appraisal that the foundation has footings that are below the frost line and were constructed in accordance with state and local building codes.

15.    Sumrell, the Debtor's own witness, stated in the Sumrell Property Appraisal that the MH was "attached to a permanent foundation system."    Sumrell never made any statement inconsistent with his appraisal.

16.    As further corroboration that the MH has the proper footings for piers, resulting in a proper foundation, Andrews opined that while he did not examine the piers of the MH, he could not imagine any building inspector issuing a certificate of occupancy without footings for the piers.

17.    The Debtor properly stated that the brick exterior veneer skirting does not support the MH.  His photographs of the gaps between the veneer curtain and the MH exterior appear to support that conclusion; however, that testimony was irrelevant because Andrews explained that the foundation support comes from the piers and footing and not the more cosmetic skirting.

18.    Probably the most revealing fact arising from the testimony about the foundation was the Debtor's own representation in the MLS listing that the foundation was built to code.  This representation is completely opposite of the Debtor's testimony stating that he had dug below the ground and found no footing.  That inconsistency makes the Debtor's testimony less than credible. The record is void of any independent evidence that the foundation does not meet the standards required by applicable building codes or that a certificate of occupancy should not have been issued.

19.     In a similar case, this court recently reviewed whether a mobile home with a certificate of title that had not been surrendered constituted real property.  *In re Smith*, Case No. 14-06277-5-SWH, 2015 WL 4594096 (Bankr. E.D.N.C. July 29, 2015).  In *Smith*, Chief Judge Humrickhouse found uncontradicted the Chapter 13 debtor's evidence that his manufactured home did not have a permanent foundation, had no block or curtain wall, and only had a faux stone curtain wall applied to wire mesh at its base.  In addition, the manufactured home was still

registered with the DMV as a motor vehicle or personal property.  The facts in *Smith* supported the court's conclusion that the manufactured home was not on a permanent foundation and could be moved.  That determination allowed the debtor to overcome the anti-modification clause of § 1322(b)(2) and bifurcate the creditor's claim.

20.     While the present case is similar to *Smith* in that the MH Title was not surrendered to the DMV, it differs with supporting evidence found by independent appraisers that the MH had a foundation that met building codes.  Further, the exterior skirting in *Smith* was faux stone on wire and not a more permanent brick skirting as the Debtor had installed.  The Debtor also admitted he had no plans to remove the brick skirting.

21.     In a different case, Judge Humrickhouse likewise found a manufactured home on the debtor's real property to be personal property and allowed a bifurcation of the secured creditor's claim. *In re Moss*, Case No. 13-04223-8-SWH (Bankr. E.D.N.C. Dec. 20, 2013).  That manufactured home had no porches, decks, or patios, and no improvements had been made to the home since it was purchased.  While there were steps leading up to the front and back of the home and vinyl skirting around the bottom of the home, the skirting was not in good condition, and the underside of the home could be easily viewed and accessed.  That manufactured home sat on cinder blocks and concrete and could be removed without damage to the land.

22.     Contrasting *Moss* to the present case, the MH has a partially covered porch and a fully covered porch.  The MH has brick skirting, installed by the Debtor to replace the previous vinyl skirting.  The brick skirting is in good condition and prevents viewing of the underside of the MH.  The MH is supported by piers and metal tie-down straps with metal anchors.  No evidence was presented that the MH could be removed without damage to the land.

23.     In *In re Terwilliger*, Case No. 13-80748 (Bankr. M.D.N.C. Aug. 16, 2013), the United States Bankruptcy Court for the Middle District of North Carolina considered whether a judicial lien which the debtor sought to avoid under § 522(f) attached to a manufactured home as real property included in the land on which it was located.[18]   In concluding that it did not, Judge Aron found that even though the home's wheels had been removed and the towing hitch, also removed, lay under the structure, the home could be moved with little effort and with no damage to the real property.   She found that there was cosmetic skirting around the home, but that skirting was easily movable and removing it would not damage the mobile home or real property.   The home had no structure such as a porch or deck that would further attach the home to the real estate. The home was placed on various columns of cinder block, was not permanently affixed, and had no foundation.

24.     None of the findings in *Smith*, *Moss*, or *Terwilliger* is consistent with the facts in the Debtor's case, and the result is the complete opposite.   The court holds that the MH is on a permanent foundation and meets the last remaining criterion of N.C. Gen. Stat. § 105-273(13)(d); therefore, the Hughes Lien encumbers both the MH and the Lot, and the Hughes Claim cannot be bifurcated unless it is wholly unsecured based upon the court's forthwith valuation of the Property.

### *Valuation of MH and Lot*

25.     The valuation of the Property by Shackelford was far more credible than that of Sumrell.   Sumrell used two comparable sales that were in Goose Creek Landing and close in proximity to the Property; however, he used a third sale that was 3.75 miles from the Property and outside of Goose Creek Landing.   Sumrell testified that the location and amenities that Goose Creek Landing provided contributed significantly to the value of property located there but only

---

[18]   The valuation procedure for lien avoidance under § 522(f) and bifurcation under § 506(a) are similar, if not identical.

allocated a negative $10,000.00 (11%) adjustment for the sale outside of Goose Creek Landing. This adjustment does not account properly for the additional value of Goose Creek Landing location and amenities. Damaging to his testimony was the fact that Sumrell had no idea that the Property had been on the market for an original listing of $194,900.00 with a reduction to $159,900.00 until he heard the Debtor's testimony at the Hearing. The failure to discover that listing in MLS indicates that Sumrell's work product is not particularly reliable.

26.    The Debtor's reliance of the Sumrell Property Appraisal's $100,000.00 valuation is of little credence when less than six months earlier, the Debtor had an active pre-petition listing for $159,900.00 and an offer to purchase the Property for $140,000.00. Without some indication that an event such as fire, wind, or water damage occurred during that time, a 33% price reduction in six months is not believable.

27.    The court found Shackelford very credible in his estimation of value. All three of the comparable sales used by Shackelford were in Goose Creek Landing, and all were within 1.2 miles from the Property, with two of the sales being less than one-tenth of a mile from the Property. Shackelford applied a $10,000.00 (7%) location adjustment for the sale that was farthest from the Property. That negative adjustment was because 310 Snow Goose Lane was closer to the navigable water. The Shackelford Property Appraisal is dated July 22, 2015. The Petition Date is February 25, 2015. The approximate five-month time differential is negligible; therefore, the court holds that the appropriate value of the Property as of the Petition Date is $130,000.00. This finding is supported by Andrews' testimony about his personal experience in buying and selling property in Goose Creek Landing.

*Valuation of Lot Only*

28.     The parties hedged their bets in the event the court did not believe the MH was on a proper foundation and submitted evidence on the value of the Lot without the MH.  The court's determination that the MH is real property and the Hughes Claim is secured by the entire Property eliminates the courts need to value the Lot alone.  The court nevertheless considered the expert testimony on this issue and again finds Shackelford the more credible witness.  In finding the Lot to have a value of $65,000.00 as of January 21, 2016, Sumrell used comparable sales that were a minimum of four miles from the Lot and not even in Goose Creek Landing.  This time Sumrell gave significant value to the location and amenities offered by Goose Creek Landing; however, the adjustments of 62.5% to 134% for location indicate that the sales used to compare values really are not comparable at all.  The three comparable sales selected by Sumrell, even within one year of his appraisal of the Lot, were a very poor choice and had no relevance to the actual value of the Lot.

29.     Shackelford did not restrict himself to MLS reporting as did Sumrell.  Shackelford was able to investigate far more comparable sales very near the Lot and within one year by doing more work.  Shackelford conducted his own research with "market participants" in order to arrive at more meaningful and relevant comparable sales.  Shackelford was steadfast in his verified research that supported his valuation of the Lot at $112,000.00 as of March 15, 2016.  While this valuation is a little over a year from the Petition Date, the comparable sales occurring during that year indicate a steady market without little fluctuation; therefore, the court concludes that the Lot had a value of $112,000.00 as of the Petition Date.

*Treatment of the Hughes Claim*

30.    The result of court's valuation of the Property at $130,000.00 is that the Plan must treat Hughes Claim as fully secured, even if the anti-modification clause of § 1322(b)(2) did not apply.  This result is because the Debtor has equity in the Property beyond the Bagley Claim and the Hughes Claim:

| | |
|---|---|
| Property Value | $ 130,000.00 |
| Less Bagley Claim | (106,390.83) |
| Less Hughes Claim | (21,319.65) |
| Debtor's Equity | $    2,289.52 |

<u>Stay Motion</u>

31.    In the Stay Motion, Hughes asserted that because the Debtor failed to keep payments on the Hughes Note current, that in the absence of adequate protection, Hughes should be granted relief from the automatic stay pursuant to § 362(d)(1).  Based upon the court's valuation of the Property, the Hughes Claim is oversecured.  Hughes is adequately protected in the short term provided that the Debtor can obtain confirmation of a Chapter 13 plan which treats the Hughes Claim as fully secured.

32.    To allow the Debtor time to amend the Plan in compliance with this Order, the court will continue the Hearing on the Stay Motion for approximately forty-five (45) days.

<u>Avoidance Motion</u>

33.    The Debtor is seeking to avoid the Judicial Liens pursuant to § 522(f) and Rules 4003(d) and 9014 of the Federal Rules of Bankruptcy Procedure.  Section 522(f) provides that a "debtor may avoid the fixing of a [judicial] lien on an interest of the debtor in property to the extent such lien impairs an exemption to which the debtor would have been entitled . . . ." 11 U.S.C. § 522(f)(1)(A).  For purposes of this statute:

a lien shall be considered to impair an exemption to the extent that the sum of—

(i)      the lien;

(ii)     all other liens on the property;

(iii)    the amount of the exemption that the debtor could claim if there were no liens on the property;

exceeds the value that the debtor's interest in the property would have in the absence of any liens.

11 U.S.C § 522(f)(2)(A).

34.    Applying the values of the Judicial Liens as they existed on the date of the Petition, the court computes impairment of the Debtor's homestead exemption as follows:

| | |
|---|---|
| Bagley Mortgage | $106,390.83 |
| Hughes Mortgage | $21,319.65 |
| Carl Perry | $ 545.72 |
| Carl Perry | $5,297.45 |
| Carl Perry | $69.13 |
| Havelock Building Supply | $120.16 |
| Yoham Zary | $1,809.79 |
| Sunland Building, Inc. | $407.20 |
| Sound Bank | $6,745.38 |
| Boulia Enterprise | $7,826.00 |
| Cedar Point Tire, Inc. | $775.94 |
| Carolina Home and Garden, Inc. | $2,751.65 |
| Paul Christopher Boie | $1,050.00 |
| Blance Delgado | $3,608.67 |
| Border Magic | $88,377.50 |
| Ally Financial | $2,924.00 |
| Wanda Hughes | $1,790.00 |
| Charles W. Hughes | $7,854.00 |
| Exemption | $30,000.00 |
| Total Liens and Exemption | $289,663.07 |
| Less: Value of Debtor's Interest | ($130,000.00) |
| Amount of Impairment | $159,663.07 |

35.    The total amount of the Judicial Liens is $131,952.59, which less than the amount of the impairment; therefore, all of the Judicial Liens are avoidable under § 522(f)(1).

CONCLUSION

For the reasons set forth in this Opinion, it is ORDERED, ADJUDGED and DECREED as follows:

1.      The MH be, and hereby is, determined to be real property under the laws of the State of North Carolina;

2.      Pursuant to the Hughes Lien created by the Hughes Deed of Trust, the Hughes Claim be, and hereby is, secured by the entire Property, consisting of both the Lot and the MH;

3.      The value of the Property securing the Hughes Claim be, and hereby is, determined to be $130,000.00;

4.      The Judicial Liens be, and hereby are, avoided pursuant to § 522(f)(1)(A) and shall have no further effect on the Property unless this case is dismissed and the Judicial Liens are reinstated pursuant to § 349(b)(1)(B);

5.      The Hearing with respect to the Stay Motion be, and hereby is, continued until 10:00 a.m. on Thursday, November 17, 2016 at the United States Post Office & Courthouse, 1st Floor Courtroom, 413 Middle Street, New Bern, North Carolina.

**END OF DOCUMENT**